ORAL ARGUMENT NOT SCHEDULED

No. 23-3641

# In the United States Court of Appeals For the Sixth Circuit

ENERGY TRANSFER LP,
*Petitioner,*
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY AND
MICHAEL S. REGAN, ADMINISTRATOR, U.S. EPA,
*Respondents,*

On Petition for Review of a Final Rule by the U.S. Environmental Protection Agency

**BRIEF OF *AMICUS CURIAE* TRANSCANADA PIPELINE USA LTD. IN SUPPORT OF PETITIONER'S MOTION FOR STAY**

| | |
|---|---|
| September 15, 2023 | Jeffrey L. Oldham<br>Bracewell LLP<br>711 Louisiana St. Suite 2300<br>Houston, TX 77002<br>(713) 221-1225 (telephone)<br>(800) 404-3970 (facsimile)<br>Jeff.Oldham@bracewell.com<br><br>Brittany M. Pemberton, *motion for admission pending*<br>Bracewell LLP<br>2001 M Street NW, Suite 900<br>Washington, D.C. 20036<br>(202) 828-1728 (telephone)<br>(800) 404-3970 (facsimile)<br>Brittany.Pemberton@bracewell.com |

*Counsel for* Amicus Curiae *TransCanada PipeLine USA Ltd.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... iii

GLOSSARY ........................................................................................................ v

IDENTITY AND INTEREST OF *AMICUS CURIAE* ..................................... 1

INTRODUCTION ............................................................................................... 2

ARGUMENT ....................................................................................................... 3

    I.    The Michigan FIP Exceeds EPA's Authority. ..................................... 3

        A.    The Michigan FIP is unlawfully overinclusive. ......................... 3

        B.    The Michigan FIP's compliance "flexibilities" do not cure EPA's failures. ................................................................... 6

    II.   EPA Failed To Consider Potential Reliability Impacts. ...................... 8

    III.  Threats to Natural Gas Reliability Support A Stay. ........................... 11

CONCLUSION .................................................................................................. 12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) .................................................................................... 5

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) .................................................................. 4

*Motor Vehicle Mrfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................. 5, 8

*In re NTE Conn., LLC*,
    26 F.4th 980 (D.C. Cir. 2022) .................................................................. 12

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ................................................................. 12

**Statutes**

42 U.S.C. § 7410(a)(2)(D)(i) ............................................................................ 5

42 U.S.C. § 7410(a)(2)(D)(i)(I) .................................................................... 3, 4

**Regulations**

40 C.F.R. § 52.41(d) ......................................................................................... 7

40 C.F.R. §52.41(d)(2) ..................................................................................... 7

40 C.F.R. § 52.45(b)(1)-(2) .............................................................................. 6

88 Fed. Reg. 36,654 (June 5, 2023) ................................................ 4, 5, 6, 7, 8, 9

**Other Authorities**

*Certification of New Interstate Natural Gas Pipeline Facilities*,
 88 F.E.R.C. ¶61,227 (1999) ................................................................................ 10

*Order Clarifying Statement of Policy*, 90 F.E.R.C. ¶61,128 (2000) ........................ 10

*Order Further Clarifying Statement of Policy*, 92 F.E.R.C. ¶61,904
 (2000) ................................................................................................................ 10

# GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| Final Rule TSD | *Technical Support Document (TSD) for the Final Rule: Final Non-EGU Sectors TSD* (Mar. 2023), EPA-HQ-OAR-2021-0668-1110 |
| FIP | Federal Implementation Plan |
| Good Neighbor Provision | 42 U.S.C. §7410(a)(2)(D)(i)(I) |
| $NO_X$ | nitrogen oxides |
| Michigan FIP | *"Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36,654 (June 5, 2023) |
| Proposed Michigan FIP | *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, 87 Fed. Reg. 20,036 (Apr. 6, 2022) |
| TPY | tons per year |

# IDENTITY AND INTEREST OF *AMICUS CURIAE*

TransCanada PipeLine USA Ltd. ("TC Energy")[1] is an energy infrastructure company that, through its subsidiaries, owns and operates thousands of miles of natural gas transmission pipelines and numerous storage facilities in North America, including more than 2,500 miles of pipelines in Michigan on the ANR and Great Lakes Gas Transmission systems. Natural gas transmission pipelines and storage facilities play a crucial part in the supply chain by connecting sources of natural gas to end-users in Michigan and around the United States. They move natural gas to large industrial and commercial customers (like power companies) and to local distribution companies, which then supply residents and businesses with natural gas and natural-gas-generated electricity for necessities such as heating, cooking, hot water, and business activities.

EPA's Michigan FIP at issue in this case directly impacts natural gas transmission pipelines like TC Energy's throughout Michigan. TC Energy's pipelines depend on internal combustion engines to ensure that Michiganders receive reliable supplies of natural gas and natural-gas generated electricity. Fifty-one of TC Energy's Michigan engines—more than any other pipeline operator—are regulated

---

[1] TC Energy Corporation submitted comments to EPA on the applicable proposed rule on behalf of its indirectly owned subsidiary, TransCanada PipeLine USA Ltd., which is the parent entity for its US natural gas subsidiaries. For simplicity, this brief refers to this entity throughout as "TC Energy."

by the Michigan FIP. As such, TC Energy has a significant interest in and can offer a perspective on the impacts of the rule in Michigan. *See* Fed. R. App. P. 29(a)(3). TC Energy has petitioned for review of all of the FIPs covered by the final EPA rule in the D.C. Circuit and moved there for a stay pending judicial review, *see TransCanada PipeLine USA Ltd. v. EPA*, No. 23-1205 (D.C. Cir. filed Aug. 8, 2023), Doc. #2011451, but also has an interest in the requests for relief in this Court.[2]

## INTRODUCTION

TC Energy supports Petitioner Energy Transfer LP's motion for a stay pending judicial review, which outlines some of the ways in which the Michigan FIP is unlawful. The motion also documents the adverse financial, operational, and practical impacts that the Michigan FIP will have. TC Energy agrees with but will not repeat all those arguments, instead explaining further two of the infirmities in the Michigan FIP and providing additional context regarding the substantial threat the FIP poses to natural gas reliability.

Most importantly, the Michigan FIP subjects all pipeline engines with a maximum rated capacity of 1,000 horsepower or greater in Michigan to stringent limitations on $NO_X$ emissions. According to EPA, these emissions must be regulated under the Clean Air Act's "Good Neighbor Provision" because they "contribute

---

[2] TC Energy states that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

2

significantly" to air-quality issues in downwind states. 42 U.S.C. §7410(a)(2)(D)(i)(I). But the Michigan FIP violates the statute and the Administrative Procedure Act: not only did EPA fail to identify the emissions "amounts" from industrial sources (including pipeline engines) that contribute significantly (which was not cured by calculating "average" national and state-wide control costs), *see* Stay Motion 21-28, but the FIP is also unlawfully overbroad. The Michigan FIP requires engines with very low emissions to install unnecessary controls that cost pipeline operators millions of dollars, all at significant risk to natural gas reliability in the state. EPA failed to consider this important issue, which portends significant public harm. The Court should grant Energy Transfer's stay motion.

## ARGUMENT

### I. The Michigan FIP Exceeds EPA's Authority.

#### A. The Michigan FIP is unlawfully overinclusive.

EPA adopted an overbroad applicability criterion that unlawfully imposes stringent emissions limitations on pipeline engines that do not "contribute significantly" to downwind nonattainment.

"[T]o identify industries and emissions unit types to include" in the Michigan FIP, EPA conducted a screening analysis in which it "focused on assessing emission units that emit > 100 TPY of $NO_X$." Screening Assessment 1-3, EPA-HQ-OAR-

2021-0668.[3] In doing so, EPA necessarily concluded that only emissions sources *above* that threshold "contribute significantly" to downwind nonattainment. If this were not true, EPA would have to "prohibit[]" emissions from lower emitting sources to comply with the Good Neighbor Provision. 42 U.S.C. §7410(a)(2)(D)(i)(I); *see also Maryland v. EPA*, 958 F.3d 1185, 1192, 1204 (D.C. Cir. 2020).

Consistent with this aim, EPA used 100 TPY of $NO_X$ as the threshold criterion for regulating cement, concrete, iron, steel, ferroalloy, and glass manufacturing in the Michigan FIP. 88 Fed. Reg. at 36,825-29. But instead of doing the same for pipeline engines, EPA regulated *all* engines with a *design capacity* of 1,000 horsepower or greater, finding that this criterion "reasonably approximates" the 100 TPY threshold. *Id.* at 36,820. Pipeline companies warned EPA that this maneuver would result in a vastly overinclusive rule, *see* TC Energy Comments 5-6, EPA-HQ-OAR-2021-0668-0380, but EPA persisted in the final Michigan FIP.

EPA's own data shows just how inapt the horsepower-based threshold is. *See Non-EGU Facilities and Units.xlsx* (Mar. 2023), EPA-HQ-OAR-2021-0668-1174 (listing about 260 engines out of 3,005 nationwide with emissions above 100 TPY). TC Energy's operations provide a case study. Of its 51 engines subject to the Michigan FIP (excluding known retirements), only 9 emit more than 100 TPY and

---

[3] Record documents are available at www.regulations.gov.

4

36 do not even emit half that amount. *Id.* And compliance will be costly: while litigation over the Michigan FIP is pending, TC Energy expects to spend millions of dollars to begin installing NO$_X$ emission controls on these engines over the next 12-18 months.

By regulating numerous engines that do not "contribute significantly" to downwind nonattainment, EPA exceeded its authority under the Good Neighbor Provision. EPA may not require emissions reductions "at odds with the [significant-contribution] threshold the Agency has set." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 521 (2014). The agency also violated its obligation to "examine the relevant data and articulate a satisfactory explanation for its action" and show "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

EPA claims its overreach is justified because (1) sources with a design capacity of at least 1,000 horsepower "contribute significantly" when considered "collectively," and (2) engines emitting less than 100 TPY might increase their emissions in the future. 88 Fed. Reg. at 36,821. Nothing in the statute authorizes EPA to regulate sources that do not individually "contribute significantly" by lumping them together. And the Good Neighbor Provision applies only to sources that "*will* . . . contribute significantly," not those that *may* do so at some unknown, future time. *See* 42 U.S.C. §7410(a)(2)(D)(i) (emphasis added). Nor is it true that it

is "not possible to guarantee without an effective emissions control program that all such units could not increase emissions in the future." 88 Fed. Reg. at 36,821. The agency could subject pipeline operators to reporting and then require compliance with emissions limits if any engine exceeds the 100 TPY threshold, just as EPA did here for low-use boilers. *See* 40 C.F.R. §52.45(b)(1)-(2). EPA's defenses lack merit.

      **B.**      **The Michigan FIP's compliance "flexibilities" do not cure EPA's failures.**

As Energy Transfer correctly explains, EPA erred by imposing pipeline engine emissions limits on *all* covered engines—even when the cost of compliance exceeds the $7,500/ton marginal cost threshold that EPA used to identify cost-effective emission reductions in the Proposed Michigan FIP. Stay Motion 21-26. Energy Transfer is also right that facility-wide averaging, case-by-case emissions limits, and discretionary extensions do not cure this problem. *See id.* 24-30. Nor, as TC Energy explains below, do these make amends for EPA's faulty applicability threshold.

      1.      Facility-wide averaging does not save the Michigan FIP. Consistent with the approach of multiple state programs, commenters urged EPA to adopt *state*-wide averaging to allow companies to leverage variations in demand across the state. INGAA Comments 26-32, EPA-HQ-OAR-2021-0668-0501; Final Rule TSD 14 & tbl. 2C. Instead, EPA authorized *facility*-wide averaging, which would allow operators to avoid installing emissions controls on every engine but only if the total

emissions from the facility do not exceed a "cap" calculated in accordance with the rule. 40 C.F.R. §52.41(d).

EPA claims that "averaging should allow most facilities to install controls on approximately one-third of the engines at their sites, on average." 88 Fed. Reg. at 36,824. But EPA arrived at this estimate using only a "subset of facilities," so it is not clear that EPA's conclusion universally applies. *See* Final Rule TSD 19. And for facilities that have only one engine or where controls are needed on more than one-third of the engines, compliance costs are unlikely to change at all.

Moreover, contrary to EPA's claim regarding the impacts of averaging, *see* 88 Fed. Reg. at 36,824, the record does not reflect that averaging is a viable option for most of TC Energy's Michigan facilities. For example, if TC Energy installed emission controls on five of the six engines at its Farwell compressor station to reduce emissions well below the Michigan FIP's requirements, it would exceed its emissions cap by operating the remaining unit without controls. *Cf.* Stay Motion Ex. A fig. 1.

And even if averaging works initially, it is not a long-term compliance solution. The cap is calculated using the facility's $NO_X$ emissions from the highest consecutive 30-day period during the *prior two ozone seasons*, 40 C.F.R. §52.41(d)(2), so installing more controls to reduce emissions and decreasing the

7

running times of uncontrolled engines mean that the cap decreases from season to season.

2. The potential for "case-by-case emissions limits" also does little to address the exorbitant costs of the Michigan FIP. Where a unit cannot meet the applicable emissions limit due to technical impossibility or extreme economic hardship, the FIP provides for EPA approval of a case-by-case emissions limit. 88 Fed. Reg. at 36,818. Although TC Energy may attempt to apply for such limits for a few of its engines, EPA has discretion whether to grant such requests and the level of "hardship" required is tied to EPA's flawed cost-effectiveness analysis. 88 Fed. Reg. at 36,819.

3. The Michigan FIP also provides for certain compliance deadline extensions, but EPA admits that the "circumstances where an extension may be warranted for any specific facility are unknown at this time . . . ." 88 Fed. Reg. at 36,749.

## II. EPA Failed To Consider Potential Reliability Impacts.

EPA failed to consider how the Michigan FIP will impact pipeline companies' ability to reliably deliver gas. This was unquestionably "an important aspect of the problem," making EPA's action arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

Commenters advised EPA of serious threats to reliability that would result from extensive changes to the natural gas transmission system in a very short time. *See, e.g.*, TC Energy Comments 12 ("Installation of controls will require taking affected units offline for extended periods of time . . . [W]ithout the additional capacity provided by the engines that have been taken out of service for retrofit/replacement, [pipelines] may not be able to keep up with demand."); Kinder Morgan Comments 36, EPA-HQ-OAR-2021-0668-0350.

EPA failed to address these comments when finalizing the Michigan FIP. It conducted an extensive reliability analysis for power plants and the electric grid, but not for natural gas transmission. *See* 88 Fed. Reg. at 36,770-75 & n.301; *see generally* Final Rule TSD, https://shorturl.at/zBHV4. Indeed, EPA's discussion of reliability in the pipeline industry is less than a page in a "timing report," which mentions "the need to allow sufficient time for planning around taking compressors offline to avoid system reliability concerns," but does not explain why reliability will *not* be a problem. EPA, *NO$_X$ Emissions Control Technology Installation Timing for Non-EGU Sources* 31 (Mar. 14, 2023), EPA-HQ-OAR- 2021-0668-1077.

EPA also misunderstands a prior comment by TC Energy in presuming that, because average capacity utilization on pipelines is 40%, there is excess capacity that will accommodate engine outages without threatening reliability. Natural gas transmission pipelines provide crucial public service, so FERC issues a certificate

allowing the construction of a pipeline *only* if the pipeline is "necessary"—meaning that, before a pipeline is even built, its capacity is already under contract. *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 F.E.R.C. ¶61,227 (1999), *order on clarification*, 90 F.E.R.C. ¶61,128 (2000), *order on clarification*, 92 F.E.R.C. ¶61,904 (2000) (setting forth an analytical framework for determining need for any proposed expansion). Additionally, to ensure reliable and sufficient supplies of natural gas, compressor stations must, by law, be designed with enough compression to provide at any moment the full capacity identified in the pipeline's FERC certificate. This means that, to provide the capacity required by FERC on peak demand days (*i.e.*, the coldest in winter and the hottest in summer), a pipeline operator needs 100% of its pipeline engines—even those that are not utilized on an average day. INGAA Comments 12. TC Energy estimates it will need 12-13 months to install controls on each engine, so some engines must necessarily shut down during peak demand periods.

All these concerns are compounded by other pipelines subject to the Michigan FIP dealing with similar outages simultaneously. Yet EPA did not account for any of this in the FIP.

### III. Threats to Natural Gas Reliability Support A Stay.

In addition to the irreparable harms that Energy Transfer has identified, *see* Stay Motion 28, a stay is justified to prevent potential natural gas service disruptions that could cause significant public harm.

In Michigan, TC Energy owns and operates (through its subsidiaries) 51 pipeline engines that are subject to the Michigan FIP—more than any other natural gas pipeline company in the state. These engines are associated with TC Energy's ANR and Great Lakes Gas Transmission systems and multiple natural gas storage facilities,[4] which deliver natural gas to Michigan's largest gas distribution and power companies, including DTE Energy, SEMCO Energy, Michigan Gas Utilities, and Consumers Energy. *See Michigan Natural Gas Utilities*, https://shorturl.at/oxVZ4. In total, millions of residents living in cities and populated areas such as Grand Rapids, Ann Arbor, and Warren City, are served by TC Energy's pipelines, and these residents need natural gas and natural-gas fired electricity for heating, cooking, and other necessities.[5]

---

[4] *See* ANR Pipeline, https://www.tcenergy.com/siteassets/pdfs/natural-gas/anr/tc-anr-pipeline-system-map.pdf;
Great Lakes Gas Transmission, https://www.tcenergy.com/siteassets/pdfs/natural-gas/great-lakes-gas-transmission/tc-great-lakes-gas-transmission-map.pdf.
[5] Population of Michigan Cities and Villages: 2010 and 2020, https://shorturl.at/cwGO5.

For the reasons discussed above, serving peak demand requires TC Energy to deploy engines that are not used when demand is lower, but trying to meet EPA's unreasonable compliance timeline (Stay Motion 29) will require TC Energy to take multiple engines offline at once, and pipelines do not have redundant compressors that can be taken offline for long stretches without impacting service. At bottom, simultaneous engine outages during peak demand will require TC Energy, Energy Transfer, and other pipeline companies to reduce capacity, injuring the public's interest in receiving a steady supply of natural gas and electricity and obtaining the reliability that they pay for. *See, e.g., In re NTE Conn., LLC*, 26 F.4th 980, 992 (D.C. Cir. 2022) (public interest in "more efficient (i.e., less expensive) electricity"); *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc*., 805 F.2d 351, 357 (10th Cir. 1986) (public interest in avoiding loss of power supply).

## **CONCLUSION**

The Court should grant Energy Transfer's stay motion.

Date: September 15, 2023                    Respectfully submitted,

<span style="text-decoration: underline">*/s/ Jeffrey L. Oldham*</span>
Jeffrey L. Oldham
Bracewell LLP
711 Louisiana St. Suite 2300
Houston, TX 77002
(713) 221-1225 (telephone)
(800) 404-3970 (facsimile)
Jeff.Oldham@bracewell.com

Brittany M. Pemberton, *motion for admission pending*
Bracewell LLP
2001 M Street NW, Suite 900
Washington, D.C. 20036
(202) 828-1728 (telephone)
(800) 404-3970 (facsimile)
Brittany.Pemberton@bracewell.com

**Counsel for Amicus Curiae TransCanada PipeLine USA Ltd.**

# CERTIFICATE OF COMPLIANCE

This brief contains 2,571 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 6th Circuit Rule 32(b). The brief thus complies with Federal Rules of Appellate Procedure 29(a)(5) and 27(d)(2).

This brief also complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

Date: September 15, 2023        Respectfully submitted,

                                 */s/ Jeffrey L. Oldham*
                                 Jeffrey L. Oldham

# CERTIFICATE OF SERVICE

I certify that on September 15, 2023, the foregoing was electronically filed through this Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by that system.

Date: September 15, 2023　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　*/s/ Jeffrey L. Oldham*
　　　　　　　　　　　　　　　　　Jeffrey L. Oldham